IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PHYLLIS ROBINSON,                )
                                 )
                Plaintiff,       )
                                 ) Case No.
        v.                       ) 3:19-cv-01092
                                 )
WILSON COUNTY SCHOOLS,           ) CHIEF JUDGE CRENSHAW
                                 )
                Defendant.       )
                                 )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

EXCERPT OF PROCEEDINGS

December 8, 2021

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:

        For the Plaintiff:  Kyle Frederick Biesecker
                            Biesecker Dutkanych & Macer, LLC
                            3200 West End Avenue
                            Suite 500
                            Nashville, TN 37203


        For the Defendant:  W. Carl Spining
                            Ortale Kelley Law Firm
                            330 Commerce Street
                            Suite 110
                            P.O. Box 198985
                            Nashville, TN 37201


PREPARED BY:
                    LISE S. MATTHEWS, RMR, CRR, CRC
                       Official Court Reporter
                      801 Broadway, Room A839
                        Nashville, TN 37203
                  lise_matthews@tnmd.uscourts.gov

1                   I N D E X

2           Wednesday, December 8, 2021

3

4              INDEX OF WITNESSES

5
WITNESSES:                                    PAGE

6

7  PHYLLIS ROBINSON
       DIRECT EXAMINATION BY MR. BIESECKER       3
8      CROSS-EXAMINATION BY MR. SPINING          50

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came on to be heard on

2   December 8, 2021, before the Honorable Waverly D.

3   Crenshaw, Jr., Chief District Judge, when the following

4   proceedings were had, to-wit:

5

6          (Proceedings reported but not transcribed.)

7          COURT DEPUTY:  Please raise your right hand.

8

9                    PHYLLIS ROBINSON,

10  called as a witness by Plaintiff, was duly sworn and

11  testified as follows:

12

13         COURT DEPUTY:  Please be seated.

14         THE WITNESS:  Okay.  Thank you.

15         COURT DEPUTY:  Please be sure to speak into

16  microphone.

17         State your full name and spell your last name.

18         THE WITNESS:  My name is Phyllis, P-h-y-l-l-i-s,

19  Veronica, V-e-r-o-n-i-c-a, Robinson, R-o-b-i-n-s-o-n.

20         THE COURT:  All right.

21         MR. BIESECKER:  Thank you, Ms. Robinson.

22

23                  DIRECT EXAMINATION

24  BY MR. BIESECKER:

25  Q.   Thank you, Ms. Robinson.  Can you hear me okay?

1  A.    Yes, I can.

2  Q.    Okay.  What education and degrees do you have?

3  A.    I have a bachelor of science degree in criminal justice;

4  my -- a minor in sociology; both geared toward juvenile

5  justice.  And I have five classes on my master's.

6  Q.    And why did you want to become a bus driver?

7  A.    Well, when I'm -- I moved here -- I've always -- I've

8  always worked with kids.  I like to work with juveniles.  My

9  interest has always been with juveniles.  So after I stopped

10  working for -- I was laid off from VF Imagewear, which is --

11  oh -- marketing company.  But I was laid off, and I decided

12  to apply for a bus driver because it was working with kids

13  and flexible hours.

14  Q.    And how old were you when you started work with Wilson

15  County?

16  A.    I'm not really sure.  Maybe -- I'm not sure.  Maybe 60.

17  Q.    Okay.  And who was your original supervisor?

18  A.    Josh -- Mr. Josh Hindman.

19  Q.    Okay.  And how were your performance reviews under

20  Mr. Hindman?

21  A.    Oh, I always got excellent and would -- my reviews was

22  always excellent.  Like -- I got perfect attendance awards.

23  I got -- they gave me a t-shirt for perfect attendance.  And

24  that -- you know, I -- it -- I worked for four years, never

25  missed a day, was never late, nothing.  Never took off.  As

 1  long as the bus was running, I was driving.  So Mr. Josh

 2  always acknowledged that.  And I kept my bus clean.

 3  Q.   And there's a three-ring binder in front of you there.

 4  And if you would, I would like you to turn to Exhibit 7, in

 5  that binder, please.

 6  A.   Sure.  I didn't bring my glasses.

 7           THE COURT:  Can you retrieve her glasses?

 8           MR. BIESECKER:  Oh, sure.  I'm so sorry.

 9           THE WITNESS:  I'm sorry.  I forgot I was going to

10  be. . .

11  BY MR. BIESECKER:

12  Q.   Well, here.  I don't want to go through your purse.

13  That was a cardinal mistake.

14  A.   Just unzip it right there.  They're right there on the

15  top.  They're just reading glasses.  Oh, gosh.

16           I'm sorry.

17  Q.   Or if it's --

18  A.   Aren't they laying right there?

19  Q.   If it's easy for you, Ms. Robinson, it's on that screen

20  as well.

21           THE COURT:  She asked do you see them on the --

22           MR. BIESECKER:  Oh, her glasses.

23           THE WITNESS:  Aren't they laying right there?  I

24  just had them.  They're not laying -- oh, well.

25           THE COURT:  Yeah.  There you go.

1          MR. BIESECKER:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          THE WITNESS:  Sorry.  Thank you.  You said number

4    7?

5    BY MR. BIESECKER:

6    Q.    Yes, ma'am.

7    A.    Okay.  Yeah.  Yes.

8    Q.    And do you recognize that exhibit?

9    A.    Yes.

10   Q.    And what are we looking at here?

11   A.    It looks like -- this looks like the hire -- a personal

12   information about myself on -- oh, no, no, no.  This is where

13   Mr. Josh gave me my annual review.

14   Q.    Your performance review from --

15   A.    Yeah.

16   Q.    -- from 2013?

17   A.    Yeah.  Above satisfactory.  Yes.  Yes.

18   Q.    Okay.  And if you would, turn to the second page,

19   please.

20   A.    Yes.

21   Q.    And can you see there where it has your total score.

22   And read the first paragraph for me, please.

23   A.    Sure.  I got -- he gave me 100.

24          "Mrs. Robinson has been an exemplary employee,

25          representing the Wilson County Board of Education

1          very well as a Professional School Bus Driver by

2          picking up and dropping off school children to

3          the various schools within our district and

4          dealing with the public.  Mrs. Robinson

5          represents the transportation department well,

6          showing professionalism and sincerity while

7          communicating with students, parents, and school

8          leaders.  She has maintained a good driving

9          record, well exceeding the minimum guidelines of

10         no more than three moving violations in a year

11         period set forth by the Tennessee Department of

12         Safety and outlined in the Transportation

13         Handbook."

14    Q.   Thank you.

15         Thank you.  And, in fact, did you actually ever

16    have any moving violations?

17    A.   No.  I never got -- never had a ticket, no.  Never had a

18    ticket.  Never had an accident on my DMV report.  No.

19    Q.   And if you would, please, turn to Exhibit 8 in that

20    book, as well.

21         And do you recognize that document, Mrs. Robinson?

22    A.   Yes.  It's another review.

23         100 percent.

24    Q.   In 2014 and 2015, review --

25    A.   Correct.

1  Q.   And if you would, just read the first paragraph there
2  before it says total score of 100, please.
3  A.   100 percent.
4           "Mrs. Robinson has been an exemplary employee,
5           representing the Wilson County Board of Education
6           very well as a professional school bus driver by
7           picking up and dropping off school children to
8           the various schools within our district.
9           In dealing with the public, Ms. Robinson
10          represents the Transportation Department well,
11          showing professionalism and sincerity while
12          communicating with students, parents, and school
13          leaders.
14          She has maintained a good driving record,
15          well exceeding the minimum guidelines of no more
16          than three moving violations in a three-year
17          period set forth by the Transportation Department
18          of Safety and outlined in the Transportation
19          Handbook."
20 Q.   Thank you, Ms. Robinson.
21 A.   Okay.
22 Q.   And again, just to be clear, during your entire tenure
23 with Wilson County, did you ever have a moving violation?
24 A.   No.  Well, I -- there were several -- you mean like when
25 driving a bus?

1 Q.    Yeah.  Did you ever have a ticket, a speeding ticket,
2 anything like that?
3 A.    No.  No, never a speeding ticket, no.
4 Q.    Okay.  Any tickets, any things -- no citations --
5 driving citations at all?
6 A.    No, no citations.
7 Q.    Okay.  And during your tenure, did you engage with the
8 children that rode your bus?
9 A.    Oh, yeah.  All the time.  Knew everyone by name.
10 Q.    And can you --
11 A.    Over 100 students on the bus.  Hmm?  I mean, yes, sir.
12 Q.    Can you provide some examples, please.
13 A.    Well, on -- every day I picked them up, they had a
14 little snack bag.  I make snack bags, especially for the
15 little babies, the kindergartens, first -- anyway, even the
16 middle school, I made snack bags.  At the end of the day, if
17 it was hot outside, they -- they would be looking for
18 popsicles, but it's the -- the kind in the plastic.  I would
19 freeze them, and by the time I get there, they just be ready
20 for them.  Birthdays, I remembered some of them birthdays.
21 They got birthday presents.  They got little snack bags for
22 Halloween, for Easter, for Christmas.  They -- they just -- I
23 don't know.  I -- I did a lot for my students.  I went over
24 and beyond with my students.  I loved those little guys.
25 Yeah.  I mean, I could ramble on and on about what I did for

1  them, but. . .

2  Q.    And during your original bus route during the time we're

3  talking about, what school age -- how old were the children

4  who rode your bus?  Were they elementary? middle school? high

5  school?

6  A.    I do elementary.  They go from K-4 to fifth grade and

7  then they go to the middle school.  West Wilson Middle School

8  is from sixth grade to eighth grade, I think.  Or maybe

9  they -- I did the elementary run.  It might be fourth or

10  fifth grade.  But then they left elementary and went to West

11  Wilson Middle School.

12  Q.    And while Mr. Hindman was your supervisor, did you have

13  any issues at all with Mr. Hindman?

14  A.    Oh, no.  Mr. Hindman, he treated every driver equally.

15  If I -- I -- I have wrote students up.  And what Mr. Josh

16  would do, he would contact the parent and call a meeting at

17  the office in Lebanon with the parent, the driver.  And the

18  student to make sure everybody was on the same page and this

19  wasn't, you know, just something that was -- but that's what

20  he did.  Mr. -- you know, Mr. Josh was -- he had an open door

21  policy.

22  Q.    Do you recall when Mr. Jerry Partlow became your

23  supervisor, roughly?

24  A.    Oh, yeah.  Yes.  Yes, sir.

25  Q.    And what year was that?  Do you recall?

A.    Hmm.  Not really.  I don't exactly know the year.  No,
sir.
Q.    Okay.  Well, I would like to move to 2016.  And during
that year, do you have about -- any idea about how many bus
drivers Wilson County employed?
A.    No, not really per se, but, like, when we would have the
meetings right before school would start, we would meet at,
like, maybe a gym.  And -- high school gym or something.  And
you could glance around -- I don't know personally.  I would
say maybe 200 or less or 300 or less.
Q.    And do you have any idea how many of those bus drivers
were African-American?
A.    Not really, but again, I would look around while I was
in there.  Personally, I would say 25 or less out of the -- I
really don't have a clue because I -- I don't know if
everyone come to the meeting or not.  But when you go to the
meetings, you can just eyeball, you know.
Q.    Okay.  And at some point Mr. Partlow became your new
supervisor.  And was he director of transportation?
A.    Yes, sir.
Q.    And what is Mr. Partlow's race?
A.    He's white.
Q.    Okay.  And did you notice a difference between how
Mr. Partlow treated African-American and white bus drivers?
A.    Yes, sir, I did.  Right off -- from when -- my first --

1  yes, when I first met him.  Yes, I did.

2  Q.   Please provide some examples.

3  A.   Well, his demeanor would change when he would be -- you

4  know, around Blacks.  I mean, that's the terminology I use,

5  Black.  He didn't -- he would -- I have seen Black drivers

6  speak to Jerry -- I mean, speak to Mr. Partlow, and he would

7  act as though he didn't even -- like, he didn't see them.

8       I myself, personally, I would speak to him, but if

9  he did speak back, it was dry.  Mr. Partlow didn't really

10  care for -- he didn't really -- I don't know.  He didn't

11  really care for me, period.  But I don't know if it's because

12  I didn't -- like, I told -- I used -- I'm an educated Black

13  female, and I'm not just going to just sit and let you talk

14  to me any kind of way.

15       I -- Jerry -- Mr. Partlow was the type of person

16  that he's got to be in charge.  He presented hisself that way

17  to me personally.  He wanted to be in charge.  It was

18  never -- you know, it's like making little remarks sometimes:

19  "I guess you're going to get over here sometime."  Like I'm

20  moving slow.  I'm not a slow move.  But -- and he used to do

21  it when -- he was -- he used to do it when no one else

22  around.

23       Like, he told me -- everybody's there for a

24  meeting.  He come to me personally, and he look at me -- and

25  it wasn't even my fault for the meeting.  It was because this

1   one driver kept being late and we had to leave a spot for her
2   to move in. And her spot just happened to be right in front
3   of my bus. And she was a white driver. We were always on
4   time. She should have been there on time. But we had this
5   meeting -- because one day -- I guess I didn't pull up --
6   didn't stay back far enough, and when she got there, she
7   tried to pull her bus in and the tail end was sticking out.
8   I couldn't back up because all the other buses was already in
9   line to pick up students. So next thing I know, there, we
10  have a meeting.
11          But anyways, Mr. Partlow came over to me -- I was
12  talking to my friend Dawn, who is a school crossing guard.
13  And Mr. Partlow came over to me and looked -- I mean, to me,
14  and he said, You people -- you people will learn there's a
15  new sheriff in town. There's new directions, new rules, and
16  you will follow them. And I said, Why you talking to me?
17  How come you're not talking to everyone? Why does this apply
18  to me? He used to always try to put me in a position to
19  become hostile, which I never would. So I just smiled at
20  him. And I told him -- I said, Well, I'm not the only driver
21  here, so you need to reference everybody else. And then Dawn
22  said, What is that all about? And I said, He just don't like
23  me. But there's been many instances Mr. Partlow has
24  presented that he don't like me. Period.
25  Q.  And I just -- so I was clear on your testimony, that

1  meeting you were referencing, it was a white driver that was

2  always late that caused the meeting?

3  A.   Yes, sir.

4  Q.   And were you supposed to get annual performance reviews

5  like the two that we looked at previously?

6  A.   Yes, sir.  All drivers are.

7  Q.   Did you ever get a performance review from Jerry

8  Partlow?

9  A.   No, sir.  Never.

10 Q.   Okay.  And then at some point in 2016, did you have a

11 disciplinary issue with a white student on your bus?

12 A.   Yes, sir.

13 Q.   Can you please tell me about that?

14 A.   It was a middle school student.  And this little boy was

15 very disrespectful, disruptive on my bus.  He would videotape

16 me, which is against school policy.  He would use profanity.

17 He would -- oh, he was off the chart.  I wrote -- I wrote

18 this kid up.  I wrote him up every day because it was every

19 day he got on my bus disrespecting me, didn't want to follow

20 any rules.  None of the other students followed him.  As a

21 matter of fact, he got on their nerves.  But I wrote this

22 student up every chance that -- every day -- every time he

23 did this.  And I kept giving them to Mr. Marlow.  That was

24 his principal.

25         And the other drivers used to write these students

up, and they would turn their papers in to Mr. Marlow, and he wouldn't even -- he would not give -- give them back, or he would not show any form of what action was taken.

Me, when I gave him a write-up, I expect to pick up what action was taken. So this particular student on a consistent basis was wrote up. And I was on -- I have papers of every day what time I wrote this student up. His mom even came out to my bus and threatened me. I mean, actually threatened me to do bodily harm, along with profanity, if I kept writing her student up. This mom on another occasion told me --

MR. SPINING: Your Honor, I object to the hearsay, please.

THE WITNESS: Oh, okay.

THE COURT: Sustained.

MR. BIESECKER: Pardon me?

THE COURT: She can't talk about what others --

THE WITNESS: I can't talk about the mom.

But anyways, yes, I did write the student up. And the student eventually was suspended. The student was suspended -- the way that the rule books are, the student has to be suspended three times and then permanently removed off the school bus for the rest of the year. Eventually the student was suspended for three times and he was taken off my bus right before spring break of 2016. He was removed from

the bus.  It was -- but a couple of days later I was called
into the office at West Park with Jerry Partlow and Theresa
Pomeroy present, for him to tell me that Wendell did not want
me driving his kids and that Wendell told me -- told him that
I was causing too much problems --

MR. SPINING:  Your Honor, again --

THE WITNESS:  -- too much problems.  Hearsay.
Okay.

THE COURT:  Sustained.

THE WITNESS:  Anyways, it was at that time that I
was told I did not have an option as far as keeping my route.
So he said he was pulling me off my route.  Mr. Partlow said
he was pulling me off of my route.  So that being said, I --
it was right before spring break.  I told them I would let
them know what I was going to do.  When I left there, I was
so distraught.  I was so bottled up.  I was -- it just -- he
took my livelihood.  Mr. Partlow.  I -- I could not explain
the way I was feeling.  Anyways, my doctor, Dr. Hamby, told
me --

MR. SPINING:  Your Honor, again, objection to the
hearsay.

THE WITNESS:  Oh, gosh.  I have a paper --

THE COURT:  Sustained.  Do you want to rephrase
your question?

THE WITNESS:  I'll rephrase it.  I was --

1        THE COURT:  Let's let him ask a question, and then

2  you can continue.

3  BY MR. BIESECKER:

4  Q.    Did you eventually resign?

5  A.    Yes.  I was -- I resigned because. . .

6  Q.    And why did you resign?

7  A.    Because my doctor told me to take the rest of the --

8        MR. SPINING:  Your Honor, objection.  Hearsay.

9        THE WITNESS:  I have a letter.

10        MR. BIESECKER:  That's her direct testimony to why

11  she was taken off.

12        THE COURT:  You can explain.

13        MR. BIESECKER:  Yeah.

14        THE COURT:  Don't refer to what your doctor said.

15  If you received a diagnosis, you were diagnosed with a

16  certain condition or something.

17        THE WITNESS:  I was diagnosed with depression.

18  BY MR. BIESECKER:

19  Q.    Okay.

20  A.    I was diagnosed with severe depression.  And I didn't

21  know how to -- it was getting close to go back from spring

22  break.  So what I did was I wrote a letter -- I, myself, was

23  thinking -- I, myself, was thinking it's best to resign than

24  get terminated, to get fired.  So I wrote this letter.  And

25  this letter was direct to all the -- all the things that I

1  felt -- I felt -- about myself that was happening to me.  It
2  was not referencing discrimination, because it was me that I
3  wrote about in this resignation letter.
4  Q.    Well -- and if I may, Ms. Robinson, I'll have you look
5  at Exhibit 17 in the binder.
6  A.    I'm sorry.
7         THE COURT:  Why don't you help her get the book.
8         COURT OFFICER:  Let me get it for you.
9         THE WITNESS:  Sure.  I can't -- can you get it?
10 I'm sorry.
11        COURT OFFICER:  Not at all, ma'am.  Not at all.
12        THE WITNESS:  What number?
13 BY MR. BIESECKER:
14 Q.    17, Ms. Robinson.
15 A.    All right.  Yes, sir.
16 Q.    Is that the resignation letter that you drafted?
17 A.    Yes, sir.
18 Q.    And so why did you draft that letter?
19 A.    Because I just didn't --
20 Q.    Did --
21 A.    I didn't want to go back because I wasn't going back to
22 my kids.
23 Q.    And what route were you going to be put on?
24 A.    Mount Juliet Middle School.
25 Q.    Okay.

A.   The one Jerry Partlow want -- he told me that was my
only option at that meeting, that I would go to Mount Juliet
Middle School.

Q.   Did anyone try to stop you or talk you out of resigning?

A.   My -- my coworkers, about -- a few of my coworkers.
They begged me not to do it.  They wanted me to stay because
they said they was going to miss me and, you know --

          MR. SPINING:  Your Honor, can we again --
objection.

          THE WITNESS:  Hearsay.

          THE COURT:  Sustained.  All right.  Sustained.

          THE WITNESS:  Coworkers.

BY MR. BIESECKER:

Q.   And do you know who -- the race of the driver that
replaced you?

A.   She was white.

Q.   Okay.  Eventually, about a year later, you came back,
correct?

A.   Yes.

Q.   Okay.  Does August 2017 sound about right?

A.   Yes, sir.

Q.   And so why did you decide to come back?

A.   Well, it was because of my coworkers, who was my -- they
were my best friends.  My coworkers wanted me -- begged me to
come back.  Because I had to took a short-run for -- Theresa

1    Pomeroy had wanted -- had asked me to do a short-run from --

2    I think it was April to school was out.  And then I came --

3    they begged me to come back and -- my coworkers wanted me to

4    come back that August, and I told them, no, I didn't want to

5    go back.  While I was out, I wanted to stay out.  Because if

6    I went back Jerry Partlow was just going to make it hell.  He

7    didn't want me back.  Jerry Partlow wasn't even expecting for

8    me to come back.

9    Q.    Did Mr. Partlow ask you to come back or contact you in

10   anyway?

11   A.    No way.  No, sir.

12   Q.    Upon your return, what bus route were you given,

13   assigned to?

14   A.    Of course Mount Juliet Middle School.

15   Q.    And were you assigned to a different bus shortly after

16   you returned, or were you given your same bus?

17   A.    Different bus.  Bus -- the bus that I was assigned to

18   was a bus that was harder to drive.  It -- it was -- it

19   just -- it was -- it wasn't -- wasn't like my regular bus.

20   It was a different bus that I was driving.

21   Q.    And how was it harder to drive?

22   A.    Well, because I had to keep doing everything manually,

23   and it was hard to do.  It was -- seemed like -- it was rus-

24   -- well, not rusted, but it was, it was harder to do.  I

25   wasn't accustom to it.  My bus -- yeah, I had been driving my

bus since I started.  And my bus was taken from me because I
was told that my bus was going to go into retirement; they
had to take it off the streets.  They didn't take it off the
streets.  I was shocked to see a white driver driving my bus
and I was stuck with this older bus that was hard to drive.

Q.    And upon your return, did you -- did you notice any
treatment between how Black drivers were treated and white
bus drivers?

A.    I always did, but those guys -- the Black drivers, they
had been there so long.  And by my not being from
Tennessee -- these guys were elderly, looking forward to
retirement.  So they had a level of acceptance.  So, yeah,
I -- I would hear them on the bus speakers having hard times
with they students, students threatening -- yes -- it --
myself, yes, I did notice a big difference in how Black
drivers was treated and white drivers.

Q.    In your opinion -- are bus accidents fairly common in
Wilson County?

A.    Every day almost.

Q.    Okay.

A.    They run into poles and trees, houses, total out buses.

Q.    And how would you define an accident?

A.    An accident to me, in my eyesight -- an accident is when
there's, like, damage done.  I mean, like -- an accident is
like -- an accident is like when that car ran up under the

bus, the back of my bus.  An accident is like when another
vehicle -- when vehicles collide -- collide and cause damage.
That's the way I see it, an accident.  Of course, an accident
can be any little thing.  I mean, it -- it depends on the
person.

Q.    Have you been involved in accidents while driving a
school bus for Wilson County?

A.    Yes.  On -- on -- I think about maybe -- I want to
say -- okay.  There was one time when I was letting my
students off the bus on Belinda Parkway, and I had my stop
arm out, my lights was flashing, everything, you know, and
there's a car coming over the hill, and it ran right up under
the back of my bus.  I mean, right up under the back.  I
was -- it was an accident that I was involved in.  But I had
no control.  He -- the -- yeah, the car ran under the back of
my bus.  Man texted.

        One time I was at Rutland, a school.  And we were
loading the students, and two of the little boys in the
second seat on my right side started getting into it.  So I
got -- I got up out of my seat to approach -- approach those
guys -- am I doing that.

        THE COURT:  Just don't get too close to the
microphone.  But you're doing fine.  Just keep going.

        You want to stay close to it.

        THE WITNESS:  Okay.  About right here.

1          THE COURT:  Yeah.  That's good.

2          THE WITNESS:  So I got up from my -- I got up from

3  my seat to stop these guys, and my -- my knee hit my gear.

4  And the bus -- knocked the bus out of gear.  And I jumped

5  over there and the front of my bus barely -- barely touched

6  Gary's bus.  Gary's bus was right in front of mine.  So Gary

7  and I were -- we're friends.  So what we said, okay, even

8  though it barely touched, we called -- we called Shane, who

9  is out at the Lebanon office.  They have Shane come out and

10  look at it and whatever.  And Shane did come out and he said,

11  okay, you guys are good to go, go on complete your route.

12  Because we didn't -- so it was that time.  That time.  Oh,

13  and then the mirror.

14  BY MR. BIESECKER:

15  Q.    And we'll talk about that one.

16  A.    Oh, then the mailbox.

17  Q.    Okay.

18  A.    There was a mailbox.  There is this -- it's like a

19  cul-de-sac.  And my student lived the second house from the

20  end on the right.  And -- I mean, do it a thousand times, you

21  can do it right.  But anyways, this particular day, the

22  neighbor was having some kind of little get- -- function or

23  something.  It was a lot of cars there.  So what I did was --

24  because we're always told don't back up.  So I couldn't back

25  all the way up out of the street.  So what I did, I backed up

1  enough to pull into the student's driveway sideway, and then
2  I was backing up.  And -- I was backing up.  And I -- I
3  looked in my mirror and I lost sight of the across-the-street
4  mailbox.  But my student that was getting off there, he was
5  looking for me.  And I said -- I -- well, anyways -- hearsay.
6  But anyways, I hit the mailbox.  I didn't, like, crush it,
7  but I bent it over.  I hit the mailbox.  It was still an
8  accident.
9  Q.    And were you disciplined for any of those accidents?
10 A.    Oh, no.  No.
11 Q.    Okay.  Are accidents cause for -- automatic cause for
12 termination?
13 A.    No.  Oh, no.  There's a lot of drivers -- is that
14 hearsay?
15        No.  There are -- some drivers -- people have
16 accident and go to training, retraining.  They don't get
17 terminated on the spot.  No.
18 Q.    Okay.  And if you're involved in an accident, as a bus
19 driver, what -- what are you supposed to do, to your
20 understanding of the manual, the transportation manual?
21 A.    Well, you're supposed -- the first thing is, you know,
22 you're supposed -- you're involved in an accident.  You radio
23 in to the shop.  So I called -- you call -- you radio in to
24 the shop.  Call David.  And then you check on your -- your
25 students that's on the bus.

1    Now, it says that you can stop, but -- or if it's
2  an unsafe place, you are allowed to move, according to the
3  paper in my. . .  But anyways, stop the bus, call in, check
4  on the students, try to -- look at the damages and -- you
5  know.  I don't know particular order.  But, yeah, that's what
6  you do.  You stop -- call in, stop the bus.
7  Q.   Okay.  And on May 11th, 2018, you were involved in an
8  accident with Bobby McDonald; is that correct?
9  A.   That's correct.
10 Q.   Okay.  Tell me what happened there, the details of how
11 that wreck happened, where you were, how it went down.
12 A.   Okay.  So you want me to just start right there at the
13 spot?
14 Q.   Yeah.  Tell me what happened with the accident.
15 A.   Okay.  I was going East Division.  He was going West
16 Division.  It's a two-lane street.  And it's very narrow.
17 Which I drove it many times.  But it's very narrow.  And on
18 my side it's a ditch, because -- then there's the railroad
19 track.
20    So I was driving.  And right when I was getting in
21 the turning lane, because there was a -- well, I was
22 waiting -- there was a black car in front of me.  So I was
23 behind this car.  And I was getting in the right turning
24 lane.  And I heard a pop.  It was a loud pop.  Really I
25 thought I had a blow-out.  But anyways, I heard a pop.  I

1  heard a pop.

2        And I -- the first thing I did was I called David.

3  I called the shop.  And I told him -- I hadn't even gone

4  across the railroad track yet.  I was just sitting there.  I

5  was talking to him first.  And I had had a couple -- I had a

6  couple students get up and look out the right side to see if

7  they could see if the tire was popped or not.  And then

8  they -- the students got all -- oh, gosh.  These are

9  preteens, teenagers.  And they heard this pop and they were

10  all riled up.  And everybody was talking and whatever.  I'm

11  just telling them to hush.  I'm just wait -- I was talking --

12  I called David.  And I was talking to him.  His first thing

13  was, is -- is there any damage to the bus?  And I said, Yeah,

14  my mirror is cracked.  He said, Well, can you drive?  And I

15  said, Yes, David, I can drive the bus.  There's nothing wrong

16  with the bus.  It's the mirror that's cracked up.  So -- and

17  he told me to go to my first stop, which was go across the

18  railroad tracks and make a right on Wilson, is where my first

19  stop was.  And I did that.  And I was talking to -- still

20  talking to him.  And I was trying to find out -- kids was so

21  loud.  But I was trying to find out who was other driver,

22  because I've never seen that bus before.  And that's when I

23  heard somebody call in and say it was Bobby McDonald.

24        Now, for him -- he didn't -- he -- he couldn't

25  stop either.  His first pull-over was about a --

1  Q.   Well, stick to -- stick to your first --

2  A.   Okay.  So I was still talking to David.  And I told him

3  how many stop -- about how many stops I had on the bus.  And

4  I -- and I -- and he said, Well, just keep talking to me

5  and -- you know, if you have any problems, just let me -- if

6  you have any problems, let me know.  So I just continued to

7  drop the students off as I got to them.  And they were -- oh,

8  God, they were so loud.  And then finally I told the

9  students -- can I say that?  I told the students, they

10  need -- you need to hush or you're going to be here sitting

11  for an hour sitting on a bus.  That's how long it's going to

12  take them to bring another bus over here.  And I said that to

13  quiet them down.  And, man, did they get quiet.  So I

14  continued to drive.  I was still talking to David.  And, you

15  know, when I got to the -- one -- the next to the last -- the

16  next to the last student house, drop-off, right there is --

17  you got to make a three-point turn -- if you know what a

18  three-point turn is.  Okay.  So -- and if you do something

19  consistently, every day, twice a day, you should get it.

20         So my thing was, I knew the left-hand mirror was

21  gone.  But I still had, like, five other mirrors.  So -- and

22  I knew exactly where to pull up.  My pull-up point was the

23  tree.  So I pulled up to the tree and did my little turn and

24  backed back out in the street.  Oh, before I -- when I

25  pulled -- before I pulled up to the tree, I looked in my

rearview mirror, the mirror over -- the rearview mirror. And
I said, oh, man this is going to be tricky. Because I was
trying to -- a 44-foot bus. But anyway, I backed on up and
kept going. And I was still talking to David, telling him
where I was.

And then when I dropped the last student off, I
told David I was on my way back to the shop. And he said,
okay, let me know when you pull up. So I was driving, and
then -- down Mount Juliet. So right before I got to West
Wilson, I got over in the left lane. And there's a turning
light there. I called David. I said, okay, I'm turning up
by West Wilson Middle School. Do you want me to pull on the
concrete block? And he said, Nah, just park in your normal
spot. So I drove around, parked in my spot. David walked
out. He had another mirror. He took off the mirror. He and
I were talking while he was doing it because it was so fast.
And he said, yeah, that was Bobby driving that other bus. He
probably couldn't judge his distance. He was in -- I said,
that wasn't Bobby's bus. He said, yeah, he was in a
different bus, and he probably couldn't judge the distance.

So I said did you bring me my accident report?
And he said, yeah. He gave me the accident report. I filled
it out and -- I gave it back to him. And I said can you put
this in the office for me? And he said, yeah. And that was
that.

Q.   Okay.  And when you say you were talking to David
Johnson the entire time, were you using a cell phone or a CB?
How were you communicating with David Johnson?

A.   No.  I was using the bus CB.  I was using the bus thing.

Q.   Bus radio?

A.   Yeah.

Q.   And are you allowed to -- bus drivers allowed to use the
bus radio while driving?

A.   Yeah.  You can.  That -- I mean, you can't use it for
pleasure, but you can -- yeah.  You're supposed to use it.
They expect for you to use it.  To communicate.

Q.   Were any students hurt?

A.   No.

Q.   Any students complain?

A.   Oh, no.  No.  Those guys was too busy coming up with
their version of what happened and -- no.

Q.   And did -- was your window broken on your side of the
bus?  Did you break -- was there a broken window, or was it
just the mirror?

A.   No, sir.  I don't drive with my window open.  I don't
like that air coming in my face.  My window -- what is that
about an inch?  My window -- if it's open, it's open about an
inch.  Maybe about an inch or so, inch and-a-half.

Q.   Okay.

A.   But, no, my window wasn't broken.

Q.    And so were the students -- I mean, I think you heard
during the opening.  Was there students brushing glass off
them, or was it some other debris?

A.    Well, I thought it was glass.  I really did.  I thought
it was glass until -- David told me it was that silver
reflector stuff.  Well, the kids was brushing it off so easy.
And -- oh, it looks like that silver confetti stuff.  I don't
know.  It's -- it's little reflector stuff.

Q.    Okay.

A.    I didn't have any glass.  I thought it was.  Because
when I got off the bus, I said, man, look at all this glass.
And David said that's not glass, that's the reflector from
the inside of the mirror.

Q.    Were you ever told who was at fault for the accident?

A.    No, sir.

Q.    Do you know if Bobby McDonald was ever disciplined for
the accident?

A.    I don't think he was.  He was right back driving.  As a
matter of fact -- hearsay.

Q.    And you testified earlier about if there's an accident,
bus drivers can be sent for training or retraining.  What
does that consist of, if you know?

A.    Well, if you have something happen on -- while you're
driving, and they'll take you back to Lebanon to the training
room, and you have to look at the videos again and go through

1  all the booklets again to, you know, address what are you

2  supposed to do when you're driving.  Evaluate your mistakes.

3  Q.    Okay.  And so then were you suspended?

4  A.    Me?

5  Q.    Were you eventually suspended for this accident?

6  A.    I didn't have any retraining.  I wasn't even given an

7  option of retraining.  I was suspended on the spot without

8  pay.

9  Q.    Well, tell me -- tell me about that, how you were

10  notified you were suspended.

11  A.    I was -- I was getting ready to leave the -- I had

12  parked my bus and I was getting ready to leave West Park.

13  And Theresa Pomeroy come running out.  And she go, Wait a

14  minute.  Don't leave.  Don't leave.  Jerry want to talk to

15  you.

16            And I said, No, I've got to go to Springfield.

17  I'm getting my mom in assisted living.  And I got to meet

18  with the social worker.

19            I don't even know where Springfield is.

20            So she said, Well, can't you just wait; he's

21  turning the corner.

22            So I was walking back toward my car, and he just

23  came up out of nowhere in that Jeep thing.  I guess it's one

24  of the Jeeps that they drive.  It's a Jeep.  County Jeep,

25  school Jeep.  So -- but he pulled up right -- right there.

1          And he said, Come over here.

2          And I said --

3          He said, I want to talk to you.

4          And I said, I got to go -- no, I can't talk right

5    now.  I got to be at Springfield.

6          And I explained to him the situation about --

7          And he said, Well, I need to talk to you.

8          I said, I can't talk to you.  You should have --

9    you should have told me before now.

10          You know.  In other words, once you're off the

11   clock, you're off the clock.  So if he had wanted to talk to

12   me, he should have told me prior to -- he could have radioed

13   me or whatever.

14          But anyway, so he said -- he wrote on the little

15   piece of paper -- he said, Here, here's my cell phone.  I

16   want you to call me.  I need to know where you are -- and I'm

17   going like, you -- you can't talk -- you don't -- you don't

18   talk to me like that.  In other words -- I can't explain how

19   I said it, but my thing is this, is, like, you talk to me the

20   way I'm talking to you.  And Jerry was not talking to me that

21   way.  He was talking to me in a very stern, like demanding

22   way.

23          And I said, Well, I'll call you.

24          But I went on and found Springfield, went on back

25   to my house.  Of course, I threw his number away because I

1 wasn't going to call.  I don't have to check in with him.
2 But when I got back to my house, it was before -- because he
3 had said 1:00.  So I got back to my house.  I had been
4 thinking about it when I was driving on the freeway.  And --
5 so when I got back to my house, I called it, in Lebanon, and
6 he -- I was going, like, okay, I finished; I'm back now.
7 What do you want to talk about?
8             He said, No, I want you to come up here.
9             And I said, Jerry, don't have any drive all the
10 way -- I've got a quarter of a tank of gas.  I mean, that's
11 enough to get me to work and back.  I said, I have a quarter
12 of a tank of gas.  Do not have me drive all the way to
13 Lebanon if you just going to fire me.
14             Oh, I'm not going to fire you.  I can't fire you.
15             I said, So --
16             I just want to talk to you.
17             I said about what?  I said, Okay.  So I went on to
18 Lebanon.
19             When I get up there, went up in the trailer.  So I
20 went in his office and I sat down.  And I said, So what do
21 you want to talk about?  So he leaned back in his chair, and
22 he going, like, just wait.  I said, What am I waiting for?
23 You told me to come up here; you wanted to talk to me.
24             Well, just wait a minute.
25             I said, Jerry, it's almost time for me to go and

1  get on my bus -- I got to go start my run.

2          No, just wait.  I'm waiting for somebody.

3          So I knew right then -- I'm like, oh, okay.  So

4  about 1:15 -- now, you done told me to be there at 1:00.  So

5  about 1:15 this woman walks in.  I don't know who she is.  I

6  never seen her before.  But I figured she had to be something

7  affiliated with him.  She walks in and she takes her seat.

8  Then he introduces her, Rebecca Owens from HR.  So I'm, like,

9  oh, God.  I'm thinking I'm going to get wrote up or

10  something.  So then they start on the video.  And, okay, I

11  watched the video, and two or three times they kept playing

12  the same thing over and over about the stuff flying in the

13  air on the kids and all that.  And I kept -- I made some --

14  oh, on the video, I said Ijamama.  And then that's when

15  Rebecca Owens says, oh, what does that mean?  And I looked at

16  her, because it's like -- I don't even know you like that.  I

17  said it's a cliche that a person would use to not use

18  profanity around kids or anywhere.  Cliche.  So she told him

19  play it again.  And I'm going oh.  So he played it again.

20  Ijamama.  Okay.

21          So then she was looking at me -- you know, I've

22  looked at -- so then that's when they came out with this

23  paper with the questions on it for me to answer.  So I'm

24  going, like -- I was reading it.  And I said, no, that didn't

25  happen.  No.  So then I told them give me the paper, let me

1  take this paper home and answer these questions

2  appropriately.  I'm not just going to jot down something.

3  No.  Because half this stuff -- so I was given the paper to

4  take home.  I was told that it had to be back in Lebanon that

5  day before 5:00, or whatever.  I made the deadline.  I went

6  straight home, answered the questions, faxed it over to these

7  guys.  And then the next thing he --

8  Q.   Well, if I may.  If you turn to Exhibit 5 in the book,

9  please.  I believe it's a copy of your suspension letter.

10  A.   Oh, yeah.  What -- where?

11  Q.   Exhibit 5, Ms. Robinson.

12          THE COURT:  Can you make it bigger so the jury can

13  see it.

14          THE WITNESS:  That's all blurry.

15  BY MR. BIESECKER:

16  Q.   Is that sufficient, or does it need to be larger?

17  A.   Yes.  This is -- yeah.  Yes.  This is the paper.

18  Q.   That's the suspension letter you received?

19  A.   Yes, sir.

20  Q.   And what's incorrect in this letter?

21  A.   Okay.  The first 3 and -- and number 4, the -- number 4,

22  right there where it says I did not check the bus to

23  determine whether it was safe -- yes, I did, because I was

24  talking to David and David asked me that same question.  He

25  said -- he asked me if anything was wrong with the bus.  And

1   I said, no.  And he said can you drive it?  And I said, yeah.
2   But anyways. . .
3   Q.    And you refused to sign this letter, correct?
4   A.    Yes, I did.
5   Q.    Okay.  Why did you refuse to sign it?
6   A.    Because you don't accuse me of doing something that I
7   did not do.
8            THE COURT:  I'm going to ask you to get a little
9   closer to the microphone.
10           THE WITNESS:  Oh.  I can't get it just right.  Oh.
11  I almost fell.
12           Because I don't -- I don't feel comfortable with
13  being accused of something I didn't do.
14  BY MR. BIESECKER:
15  Q.    Okay.  And eventually, after this -- after the
16  suspension meeting, were you terminated?
17  A.    Oh, yeah.  I -- I feel this letter was already wrote up
18  when they got there, because they pulled it right out.  So
19  you already knew you were going to terminate me.  He
20  suspended me without pay on the spot.  I refused to sign it.
21  She told -- Rebecca Owens told Jerry Partlow, oh, just go on
22  and sign refused to sign.  And that's when he did that.  And
23  then a couple of days later -- a couple of days later I get a
24  letter from Donna Wright telling me I'm terminated.  So I'm
25  going, like --

1 Q.   Well, if you would turn to Exhibit 6 in that binder in

2 front of you.

3 A.   6.  Okay.  Yeah.  Yes, sir.

4 Q.   Is that a copy of the termination letter you received?

5 A.   Yes, sir.

6 Q.   And just go back real quickly.  I want to make sure it's

7 clear.  The suspension letter you received was already typed

8 up and waiting for you during your suspension meeting; is

9 that correct?

10 A.   That's right.  Yes, sir.

11 Q.   Okay.

12 A.   Can I -- no.  Go on.

13 Q.   And you received this letter in the mail?

14 A.   Yes, sir.

15 Q.   Did you have any meetings or communications regarding

16 your termination, or did you just receive this letter?

17 A.   No, sir.  Can I say as well --

18         THE COURT:  Wait on him to ask a question.

19 BY MR. BIESECKER:

20 Q.   Well, is there anything you don't agree with in your

21 termination letter?

22 A.   Yeah.  I was just going to say in both -- these --

23 these -- they are -- I'm being accused of admitting -- you

24 admitted that you. . .  I never admitted that.  If you would

25 look -- I mean, I never admitted that.  I never said I hit

1  Bobby's bus.  They keep saying you admitted hitting his bus.

2  You admitted caused the accident.  No.  There's a lot in

3  there.  I disagree.

4  Q.    Okay.  Anything else other than the admissions they're

5  referring to?

6  A.    I'm sorry?  What did you say, sir?

7  Q.    Anything else you disagree with in this letter other

8  than the admissions that you discussed?  Or anything else

9  that's untrue in this letter?

10 A.    Well, I don't know if -- it's saying you did not stop --

11 you -- you -- you -- I -- is it you or I?  I have to stop the

12 bus.  It's a railroad track.

13 Q.    Okay.

14 A.    The bus was stopped.

15 Q.    And did you -- did you write a letter in response to

16 your termination letter?

17 A.    Yes, sir.  About three pages.

18 Q.    If you would, turn to Exhibit 4 in that binder in front

19 of you, please.

20 A.    Okay.  Yes.  Yes, sir.

21 Q.    And do you see that?  Do you see Exhibit 4?

22 A.    Yes, sir.

23 Q.    And who is Donna Wright?

24 A.    Donna Wright, from my -- is it director of schools or

25 something?  I think she's the director of schools.

1  Q.   And why did you feel compelled to write this letter?

2  A.   Oh, God.  I was just -- I was -- I was very distraught.

3  I was very -- it's hard to -- it's hard for me to explain

4  what compelled me to write these letters.  Feelings -- I was

5  just -- I was just -- I was very despondent.  I was -- I just

6  -- it was just, like, unbelievable feelings of -- feelings

7  of. . .

8  Q.   Well, in -- excuse me.

9       In paragraph 1 -- I would like to draw your

10  attention to paragraph 1 of your letter there.  You say, I

11  would like the investigation not to include Jerry Partlow

12  director of schools -- or I'm sorry.

13       "I feel that my initial investigation was bias and

14  bias on discrimination of my racial heritage.  I would like

15  to request that my investigation not include Jerry Partlow,

16  director of school transportation, or Rebecca Owens, deputy

17  superintendent."

18       So how did your feel like your race was at issue?

19  A.   How do I -- I didn't -- I didn't see that, what part you

20  speaking of.  The second paragraph?

21  Q.   The first paragraph.

22  A.   Oh, the first paragraph.

23       THE COURT:  Why don't we take our morning break

24  and then maybe you can enlarge it or get it so it's clear.

25  Because I think the jury's having trouble at this point.

1          MR. BIESECKER:  Thank you, Your Honor.

2          THE COURT:  All right.  We'll take a 15-minute

3    break.

4          (Recess.)

5          THE COURT:  All right.  Be seated.

6          All right.  We can continue with the direct

7    examination.

8    BY MR. BIESECKER:

9    Q.   Ms. Robinson, looking at Exhibit 4, that you reviewed

10   again.

11         THE COURT:  Did we pass out the exhibit books to

12   the jury?

13         MR. BIESECKER:  Yes, sir.

14         THE COURT:  Okay.  Good.  Good.

15   BY MR. BIESECKER:

16   Q.   So I'm --

17         THE COURT:  That's one --

18         MR. BIESECKER:  I'm not going to put anything up

19   there any more.  Is that okay?

20         THE COURT:  That's fine.  Is that 1 through 21?

21         MR. BIESECKER:  Yeah.  I assume that might be

22   easier with the exhibit books.

23         THE COURT:  Indeed.

24   BY MR. BIESECKER:

25   Q.   Ms. Robinson, looking at Exhibit 4.  You reviewed that

1  again.

2         You drafted that letter to Donna Wright; is that

3  correct?

4  A.   Yes.

5  Q.   And do you stand by everything in that letter?

6  A.   Yes.

7  Q.   Okay.  Now, I would like to move on.

8         Do you know if it's a state law for a bus driver

9  to use a cell phone while they're driving?

10 A.   No, it's against the rules.

11 Q.   Okay.  I would like you to turn to Exhibit 3.

12        And there we have the Tennessee Code.  Have you

13 seen that Code before, regarding school bus drivers and use

14 of cell phones?

15 A.   Yes, sir.

16 Q.   And on page 2 of the exhibit, section D, it lays out

17 what the penalties are for that, for violation of this Code,

18 correct?

19 A.   Yes.

20 Q.   And you also, I believe testified, that it's a violation

21 of Wilson County's transportation manual; is that correct?

22 A.   Yes.

23 Q.   If you would, turn to page -- or Exhibit 13.  And let me

24 know when you're there on the first page.

25 A.   Yes.

1  Q.   Are you there?

2  A.   Yes.

3  Q.   And did you write Exhibit 13, page 1?

4  A.   Yes.

5  Q.   Do you recognize that as the Wilson County

6  transportation manual?

7  A.   Yes, sir.

8  Q.   And I believe it's dated July 1, 2017, correct?

9  A.   Yes, sir.

10 Q.   If you would turn to page 7 of that manual.  And the

11 page numbers are in the upper right-hand corner.

12 A.   Yes.

13 Q.   And do you see the bottom of page 7 there, where it

14 talks about cell phone usage?

15 A.   Yes, sir.

16 Q.   And is that the policy as you understood it during your

17 employment with Wilson County?

18 A.   Yes, sir.

19 Q.   And could you please -- what is the -- could you read me

20 what the -- the penalty is for being caught in violation of

21 cell phone?  The third sentence there.

22 A.   "If a driver's found to have violated this prohibition,

23 it will result in the recommendation for immediate

24 termination."

25 Q.   Thank you.

1    And when you received your letter of termination,
2    just to be clear in the record, were you ever offered the
3    opportunity to retain?
4    A.   No, sir.
5    Q.   No retraining on the policy and procedural manual?
6    A.   No, sir.
7    Q.   Have you ever been offered your job back, where they
8    said, hey, can you come back to us?
9    A.   No, sir.
10   Q.   Okay.  During your time at Wilson County Schools, were
11   you aware of any white bus drivers being caught using their
12   cell phone?
13   A.   Yes.
14   Q.   Yes?
15   A.   Yes, sir.
16   Q.   And who were those folks, if you can remember?
17   A.   I can't -- I can -- I know for -- I know -- I don't know
18   their -- last -- Gary --
19   Q.   Well, I may be able to help.  Exhibit 2.  If you turn to
20   Exhibit 2 of your binder there.  This is a list of -- of bus
21   drivers who were terminated during the relevant timeframe.
22   And it has the race, name, and reason there on Exhibit 2.
23   A.   I know --
24   Q.   Well -- and -- so do you recognize the name Gary Stomal?
25   A.   Yes.

```
1   Q.   And do you see Mr. Stomal listed on there?

2   A.   Yes, sir.

3   Q.   And do you recall him?

4   A.   Yes.

5   Q.   Was he caught using a cell phone?

6   A.   Yes.

7   Q.   And what was Mr. Stomal's race?

8   A.   He was white.

9   Q.   And was he allowed to return?

10  A.   Yes, sir.

11  Q.   Okay.  Do you remember a Henry Ricky Tudors?

12  A.   Yes.

13  Q.   And what was Mr. Tudor's race?

14  A.   White.

15  Q.   And do you recall if he was caught using a cell phone?

16  A.   Yes.

17  Q.   And was he returned to work?

18  A.   Yes.

19  Q.   Do you recall working with a Michelle Watson?

20  A.   Yes.

21  Q.   And what was her race?

22  A.   White.

23  Q.   And was she caught using her cell phone?

24  A.   Yes.

25  Q.   And to your knowledge was she returned to work?  Do you
```

1 know?

2 A. I'm not sure, but I think Michelle did go back to work.

3 Q. Okay.

4 A. That was while I was there.

5 Q. While you were still employed with Wilson County?

6 A. Yeah. So I don't know, but what's -- I don't -- yeah.

7 Yes, sir.

8 Q. And if you turn to the second page of that exhibit, they

9 were all -- all these bus drivers were supervised by

10 Mr. Partlow; is that your recollection?

11 A. Yes, sir.

12 Q. Okay. Any other white bus drivers you're aware of that

13 had severe wrecks were allowed to continue working to your

14 knowledge?

15 A. Yes, but I -- I did not know their names.

16 Q. Okay.

17 A. I know there were other drivers caught, yes.

18 Q. Okay. You can set that exhibit down.

19 What were you making per hour with the school?

20 A. When I left?

21 Q. Yes, ma'am.

22 A. I think they had -- I think they had just gave us a

23 raise. It was 16 -- $16 and some change.

24 Q. If you would, turn to Exhibit 9.

25 A. Yes.

1  Q.    Is that -- do you recognize that as one of your last
2  paychecks?
3  A.    Yes, sir.
4  Q.    And I believe it says you're making 19.98 an hour; is
5  that correct?
6  A.    Yes.
7  Q.    And how many hours a week did you work?
8  A.    30.
9  Q.    Okay.  Did you have any other benefits with Wilson
10 County?
11 A.    Any?
12 Q.    Any other benefits besides your hourly wage?
13 A.    Well, I had my medical -- my medical.  I don't -- just
14 my medical.  Medical, dental.
15 Q.    And you mean medical insurance?
16 A.    Medical insurance, yes.
17 Q.    Okay.  And was there any sort of summer benefit pay or
18 paycheck like that over the summer?
19 A.    Yes.  We always had an end-of-the-year bonus.
20 Q.    And how much was that?
21 A.    I'm not really sure because it went up.  It's about
22 maybe 900.
23 Q.    Okay.  And after your termination from Wilson County
24 Schools, did you have an the opportunity to continue your
25 insurance benefits?

1   A.   No.  I -- I was offered COBRA, but it was way too high.
2   Q.   Okay.  So you couldn't afford to pay the COBRA premium?
3   A.   No, sir.
4   Q.   Did you have any uncovered medical bills due not to
5   having insurance with Wilson County, that you had to pay out
6   of pocket for?
7   A.   Yes.
8   Q.   Do you know how much -- about how much those were?
9   A.   You mean unpaid medical bills?
10  Q.   Or bills you had to pay out of your pocket.
11  A.   Oh.  I don't know.  Maybe about -- I don't understand
12  the question.
13  Q.   Due to your loss of insurance -- you had insurance with
14  Wilson County, medical insurance, correct?
15  A.   Yes, sir.
16  Q.   And you lost that insurance when you were terminated?
17  A.   Yes.
18  Q.   And you could not afford the COBRA payments, correct?
19  A.   No.
20  Q.   And do you remember how much the COBRA payments were
21  monthly?
22  A.   $2,300 a month.
23  Q.   And as a result of not having insurance with Wilson
24  County, did you have any medical bills that you had to pay
25  out of your own pocket or remain owing?

A.    Oh, yes.  About -- about $5,000.

          THE COURT:  I need you to talk into the
microphone.

          THE WITNESS:  About $5,000.

BY MR. BIESECKER:

Q.    Okay.  And if you would, turn to Exhibit 10.  And do you
recognize these as your income tax returns for 2018?

A.    Yes, sir.

Q.    And you have two dependents listed?  Who are those
dependents?

A.    My granddaughter and my grandson.

Q.    Okay.  And did they live with you in 2018?

A.    Yes, sir.

Q.    Okay.  If you would turn to Exhibit 11.

          Do you recognize that as your 2019 taxes?

A.    Yes, sir.

Q.    And you have two dependents listed there, as well.
That's grandchildren, correct?

A.    Yes, sir.

Q.    And did your grandchildren live with you in 2019?

A.    Yes, sir.

Q.    Did they live with you in 2020?

A.    No.  After -- after I was evicted, I had to send them to
my daughter.

Q.    Okay.  And when were you evicted?  Do you recall?

1          Well, actually, if you would turn to Exhibit 12.

2          Is this the eviction order you're speaking about?

3    A.    Yes, sir.

4    Q.    Okay.  And when were you evicted?

5    A.    Well, a fought it as long as I could.  I was actually

6    extricated on Mother's Day, May 12th.

7    Q.    Okay.  And why -- what happened when you were evicted

8    with. . .  What happened to your property and the home,

9    et cetera?

10          Well, how is this -- or please go ahead.

11   A.    I lost everything.  Everything was thrown out in the

12   yard.  I don't like talking about it.

13   Q.    Okay.

14   A.    All the kids' stuff.  Everything.  I don't like talking

15   about it.

16   Q.    Okay.

17   A.    I'm sorry.

18   Q.    Can you talk about how it mentally and emotionally

19   affected you to lose your job from Wilson County?

20   A.    Yeah.  They took everything from me.  Everything.  I

21   lost everything.  Just -- they didn't want to account for

22   anything.  I lost everything.  I lost my livelihood.  I lost

23   faith.  I -- I. . .  It's something that can -- I -- I won't

24   never get over.  I'm still being treated for it.  It's called

25   depression.  It's called being distressed.  It's called being

humiliated.  It's called -- everything that you can think of.
For no reason.
Q.    Okay.  Thank you.
        MR. BIESECKER:  If I may have just a few minutes,
Your Honor, with my notes.
        THE COURT:  Sure.
        (Respite.)
        MR. BIESECKER:  I have no further questions, Your
Honor.
        THE COURT:  All right.  Cross.

                    CROSS-EXAMINATION
BY MR. SPINING:
Q.    Good morning, Ms. Robinson.  My name's Carl SPINING.
We've met before.  But I have a couple of questions for you
this morning.
        I was going to start with the pay stub that you
were just talking about, and, specifically, the benefits that
you received during your term of employment with Wilson
County Schools in the 2017 and 2018 year.  Do you follow me?
You started back to work in August of 2017, correct?
A.    Correct.
Q.    And you worked for the school year of 2017 and 2018, up
until your termination later in May, correct?
A.    Yes.  In May.

1         THE COURT:  Okay.  I need you to get closer to

2 that microphone.

3         THE WITNESS:  May.

4         THE COURT:  Thanks.

5 BY MR. SPINING:

6 Q.   And I wanted to see if I could refresh your memory that

7 perhaps you did not receive medical benefits during that term

8 of employment.  That you were actually on Medicare during the

9 time that you were employed May of -- school year 2017/2018.

10 Does that refresh your memory?

11 A.   I have always gotten Medicare since I turned 66.

12 Q.   Fair enough.  But you did not receive medical benefits

13 from Wilson County during your employment from August of 2017

14 to 2018, correct?

15 A.   I'm not sure.  Did I sign back up?

16 Q.   Well, your benefits are on your pay stub, which was

17 Exhibit 9.  And it lists, of course, Social Security.  And it

18 lists things like holiday and snow time and even training

19 time as benefits.  But it nowhere indicates that you were

20 receiving medical benefits from Wilson County and having it

21 deducted from your paycheck.

22 A.   I never noticed my paychecks as far as that.

23 Q.   Okay.  Also, I wanted to ask you, after your termination

24 from Wilson County Schools, did you find other employment?

25 A.   No, sir.  I did -- I tried.

1  Q.   Well, again, just to refresh your memory, didn't you
2  work at a camp?  I think it was called Burns --
3  A.   Yes, I did.
4  Q.   And did you receive compensation for that work?
5  A.   Yes, I did.
6  Q.   Do you recall what your wage was?
7  A.   Maybe $170 every two weeks.
8  Q.   And how long did you work there?
9  A.   From August of -- September of 2019 until the -- when
10 they had to shut down, when the virus came, I think, in
11 March.
12 Q.   March of '20?
13 A.   Yeah.
14 Q.   And you also worked at AAOC, which was also a camp?
15 A.   Yes.
16 Q.   And when did you work there?
17 A.   Prior to the Burn Boot Camp.
18 Q.   And how long did you work there?
19 A.   About seven months maybe.
20 Q.   And what was your compensation?
21 A.   $300 -- I think it was $300 a week there.
22 Q.   And did you seek any other employment besides those two
23 jobs?
24 A.   Yes, I did.
25 Q.   And was that at Wise Coach?

1  A.    Yes.

2  Q.    Did you receive that employment?

3  A.    No.  I didn't get hired.

4  Q.    Why not?

5  A.    Because of my medication.

6  Q.    Did you fail the drug test for being a driver?

7  A.    Yes.  I always failed the drug test.

8  Q.    Had you had surgery recently when you made that

9  application?

10  A.    No, I hadn't had surgery then.

11  Q.    When you were terminated, I think later that summer,

12  didn't you go have hand surgery?

13  A.    Oh, after -- you're talking about Wilson County?

14  Q.    You were terminated in May of 2018.

15  A.    And in June of 2018, I had to have carpal tunnel surgery

16  for my hand when my hand was damaged from doing the --

17  pushing and the pulling on the brakes.

18  Q.    And you also had a surgery in October of 2017.  Do you

19  recall that?  And you were off work for two months, from

20  October to --

21  A.    Was it '17 or '16?

22  Q.    It was '17.

23  A.    Okay.  If it was October '17 -- I thought it was October

24  '16.  I had back surgery.

25  Q.    And then prior to that, in April and May of '16, you

1  requested leave from Wilson County Schools to have rotator

2  cuff surgery.  Do you remember that?

3  A.   Yes, but I didn't get it.  I wasn't approved and I

4  didn't get that surgery.

5  Q.   But you submitted leave requests to go have the surgery?

6  A.   I submitted a request for leave, FMLA.

7  Q.   And then it was that same summer, July of '16 that you

8  resigned from your employment in your first tenure with

9  Wilson County Schools, correct?

10  A.   That is correct.  That is -- yes.  That is correct.

11  Q.   Have you sought any other employment since your

12  termination other than the three that we've talked about?

13  A.   No.

14  Q.   Can you operate a school bus now?

15  A.   Not at the present time, no.

16  Q.   And could you operate a school bus in the summer of

17  2018?

18  A.   Yes.

19  Q.   When did you lose the ability to operate a school bus?

20  A.   Just this year.  October -- I had my total shoulder

21  replacement in -- June 22nd of this year, 2021.

22  Q.   When you applied for the job at Wise Coach, what

23  medications were you taking that prevented you from passing

24  their drug test?

25  A.   For my depression.  For -- I was taking my gabapentin,

1  my hydrocodone, my Flexeril, my sertraline.

2  Q.    And hydrocodone is a pain medicine, correct?

3  A.    Yes.

4  Q.    And what was that treating?  What pain were you having?

5  A.    It was for my back.

6  Q.    No.  I'm -- what was the injury to your body that caused

7  you to take hydrocodone?

8  A.    My back.  My back.

9  Q.    Oh, I'm sorry.  I didn't hear you correctly.  Thank you.

10  A.    Sure.

11  Q.    Now, when you worked at Wilson County schools, you

12  had -- you were provided a handbook that had the rules and

13  regulations.  And I think you've already read some of those.

14  You had that handbook in your possession, correct?

15  A.    That's correct.

16  Q.    And you received training from I think Theresa Pomeroy

17  or someone else at the bus depot --

18  A.    (Witness moves head from side to side.)

19  Q.    You didn't receive any training?

20  A.    Yes, but Theresa never trained me.  I had my training in

21  Lebanon and it was with -- oh, God.  What's her name?  Out in

22  Lebanon.  Not Theresa, though.

23  Q.    Okay.

24  A.    It was --

25  Q.    Was she an employee of Wilson County Schools?

1  A.    Teri.  That's her name.  Teri.

2  Q.    Thank you.

3  A.    Teri trained me.

4  Q.    And did she provide you information about the rules and

5  regulations for driving a bus?

6  A.    Of course.

7  Q.    And, in fact, I think you obtained your CDL to be able

8  to drive a bus, right?  You didn't have one before you became

9  a bus driver?

10  A.    No, I did not.

11  Q.    And in the handbook and in your training, did you learn

12  that in the event of an accident, you are to stop the bus --

13  is that correct?

14  A.    Yes.  Yes, that's correct.

15  Q.    And you are to check on the -- on the students, correct?

16  A.    That's correct.

17  Q.    And you are also to check on the status of the bus,

18  correct?

19  A.    That's correct.

20  Q.    And, in fact, you had experience with these protocols in

21  your previous accidents as a bus driver; is that true?  Let

22  me -- I'll try to be more specific.

23  A.    With two.

24  Q.    Correct.  So you had the accident -- I think it was at

25  Rutland, where you accidentally knocked the bus into gear and

1    it rolled back into a different bus, correct?

2    A.    They didn't touch.  But you're correct, it was at

3    Rutland.

4    Q.    And sounds like a pretty minor accident; is that fair?

5    A.    The buses didn't touch.

6    Q.    And still you called the bus depot, Mr. Shane Cook, to

7    come out and inspect, correct?

8    A.    Gary called.

9    Q.    And you waited there with the buses stopped until

10   Mr. Cook came to examine the buses; is that right?

11   A.    Yes, we did.

12   Q.    And you did not continue your route until Mr. Cook gave

13   you the go-ahead, correct?

14   A.    We hadn't started the route.  But, yes.

15   Q.    So you didn't have any students on the bus?

16   A.    They were loading.

17   Q.    Because that's what -- I was thinking you said that --

18   A.    Oh, you're saying on the route.  We wasn't on the route.

19   Q.    Not on the route.  When you knocked the bus out of gear,

20   you were getting out of your seat to try and address some

21   student behavior; is that right?

22   A.    Right.  They were loading the -- the students was

23   loading.  And, yes.

24   Q.    And in that situation, you followed the protocols when

25   an accident occurs, correct?

1  A.    Yes.  We called Shane.

2  Q.    And you were not terminated for having that accident,

3  were you?

4  A.    No.

5  Q.    You continued to drive for Wilson County Schools,

6  correct?

7  A.    That is correct.

8  Q.    For several more years, until you resigned, right?

9  A.    I don't remember how long, but, yes, I did.

10  Q.    And you also had another accident that -- that was not

11  your fault.  You mentioned it.  But the car ran into your

12  bus.  And in that accident you stopped the bus immediately,

13  correct?

14  A.    The car ran under the back of the bus and the bus was

15  sitting still with the -- with all the stop signs and

16  flashing lights on.  Students was unloading.

17  Q.    And you did not continue your route, correct?

18  A.    There was a car under the bus.  No, I didn't continue

19  the route.

20  Q.    So the point is that you stopped the bus, you checked on

21  the children, and you waited for someone to bring you a new

22  bus in that incident, correct?

23  A.    I want to say yes, but you're not stating it right.  The

24  bus was stopped.  And when the car ran under the back of the

25  bus, I had to call dispatch.

```
 1   Q.    And you had to wait?
 2   A.    Yes.
 3   Q.    Until they brought you a new bus, correct?
 4   A.    Correct.
 5   Q.    Now, in the accident on May 11th of 2018, you and
 6   McDonald, for lack of a better term, hit mirrors; is that --
 7   is that fair?
 8   A.    That's not fair.  Because I did not know it was Bobby at
 9   the time.  And the mirrors touched.  They didn't hit.  They
10   barely touched, really.  Because they just popped.
11   Q.    Fair enough.  You heard a pop, and that was your first
12   notice that something had gone wrong, right?
13   A.    Exactly.  A loud pop.
14   Q.    And, in fact, I think you said both in your testimony
15   and on the tape that you thought maybe it was a blow-out or a
16   flat tire, correct?
17   A.    That's correct.
18   Q.    And yet you continued driving the bus, true?
19   A.    No.  The bus was -- we -- I wasn't driving the bus.  The
20   bus was just going to the turning lane of the -- okay.
21   Q.    Did you stop and get out of the bus and inspect what
22   damage may have occurred?
23   A.    The bus was stopped.  No, I did not get out of the bus.
24   As soon as I heard the pop, or whatever, and I -- the kids
25   looked to the right to see if it was a blow out.  Then I
```

1  looked to the left and I said, oh, she cracked my mirror.

2  And I called David.

3  Q.   So it was a few seconds or so after the pop that you

4  realized that you didn't have a mirror, correct?

5  A.   No.  I got back in my seat and I looked to my left and

6  that's when I noticed it was popped.  It was cracked.  And I

7  called David.

8  Q.   And you said in your direct testimony that the left-hand

9  mirror was gone?

10  A.   No, it wasn't gone.

11  Q.   It was unusable, right?

12  A.   Well, it -- the -- it was about that much on the top,

13  but, no, you couldn't actually -- the biggest part of it was

14  gone.  Yes.

15  Q.   And --

16  A.   But the mirror was still on the bus.

17  Q.   Correct.  But it didn't work as a mirror?  You couldn't

18  use it to see, correct?

19  A.   No.  Not really.

20  Q.   And also when you heard the pop, some debris came inside

21  of the bus on to you and on to the other children, correct?

22  A.   Yes.

23  Q.   And did you know that they were trying to brush this

24  material off of them, or did you ever check on them?

25  A.   Well, we all was doing, like -- well, yeah, they were

1    doing like that.  But, no, I didn't get up -- I looked back.

2    I just looked back.  I looked back to see what one was doing.

3    Q.    But isn't the protocol to stop the bus and get up and

4    check on the children to see if they're okay?

5    A.    The bus was stopped.  And, yes, protocol is stop the bus

6    and check the kids.  But the bus was already stopped.  And I

7    didn't get up actually to check on the kids.  I just looked

8    back at the kids.  So, yes.  You're right.  Stop the bus and

9    look at the kids.  Check the kids.

10   Q.    You say the bus was stopped.  But you did continue your

11   route, right?

12   A.    Because David told me to.  Well, he asked me -- the

13   first thing David said is, is the bus okay?  And I said,

14   yeah, the mirror's cracked.  And he said can you drive?  And

15   I said, well -- jokingly I said, yeah, I can drive, David.

16   Of course.

17   Q.    So you told him that the mirror was cracked; is that

18   right?

19   A.    What -- what terminology would you use?

20   Q.    Well, in fact, the mirror was unusable?  You didn't tell

21   him that you couldn't see out the mirror, did you?

22   A.    Okay.  Yes, sir.  To me -- can I -- when I say

23   cracked -- okay.  If a mirror is cracked, it's common -- it's

24   unusable, isn't it, if it's cracked?  What do you say?

25   Q.    I'm asking you if you could use that mirror in its

1  condition after you heard the pop?

2  A.    No, I couldn't use it.

3  Q.    And so you're driving, I think you said, a 44-foot bus?

4  A.    That's correct.

5  Q.    Without a driver's side mirror, correct?

6  A.    That's correct.

7  Q.    And you discussed in your direct testimony the

8  three-point turn that you had to make.  And you admitted that

9  it was going to be a tricky turn, right?

10 A.    Yes, I did.

11 Q.    And that's because you didn't have a mirror on your

12 driver's side, correct?

13 A.    That's correct.

14 Q.    Now, you also made the statement -- it was in your

15 direct, but it's on the video, too, that if I have to stop

16 this bus, then you're not -- you kids are not going to get

17 home until 5 or 6:00, right?

18 A.    That's correct.

19 Q.    And that was a reference to your previous experience

20 that delays happen when you have to report an accident; is

21 that right?

22 A.    No.  It's just that they were being so loud and I

23 couldn't hear David talking and I couldn't talk.  They were

24 being so loud, overtalking me, I had to use some type of

25 tactic.  And I told them, if you -- if you keep going, you

1  keep talking, you're going to be stuck on this -- wait for a
2  whole -- I said, it's going to take an hour for them to bring
3  us another bus and you won't get home until 6:00, so just
4  keep talking.
5  Q.    And you said that to the children, is that right, that
6  were on the bus?
7  A.    Yes, sir.
8  Q.    Now, I wanted to make sure I clear up a couple of names
9  that we've talked about.  I think it's clear, but David
10 Johnson is the person that you're talking to on the radio,
11 correct?
12 A.    That's correct.
13 Q.    And he is a mechanic with the Wilson County Schools that
14 works over at the shop or the bus depot, correct?
15 A.    That is correct.
16 Q.    And he's someone that you do talk to if you have a need
17 while you're driving the bus, right?
18 A.    That's correct.
19 Q.    And Shane Cook -- you mentioned Shane.  His name is
20 Shane Cook.  He also works at the bus depot, correct?
21 A.    In Lebanon, yes.
22 Q.    And he's a person that you might communicate with if you
23 have a need for your -- for your bus, right?
24 A.    Yes.
25 Q.    And then we talked briefly about Theresa Pomeroy, but

1 she is an employee of Wilson County Schools also, correct?

2 A. Yes.

3 Q. Now, you also testified on direct, and it's in the

4 video, but when you parked your bus at the end of your route

5 and you were back at the bus depot, you got up and brushed --

6 and you said, oh, my, there's a bunch of glass here, right?

7 A. That's correct.  That's what I thought it was.

8 Q. But the entire time that you thought that there was

9 glass inside your bus, you never checked on whether any of

10 the students were injured or needed any kind of assistance?

11 A. Oh, say that -- what were you --

12 Q. The entire time that you thought that glass had entered

13 into your bus from the pop noise, you never checked on the

14 children or asked if they were okay or tried to assist them

15 in any manner, even though you thought that perhaps glass had

16 come into the bus and gotten onto them?

17 A. I didn't say that until I got back and park the bus and

18 I -- and I -- I was looking, I'm going, like, God, I've got

19 all this glass over me.  And David said, no, that's the

20 reflect- -- I didn't say -- I didn't think it was glass when

21 it first happened.  When -- when the accident first -- when

22 the two mirrors touched?  I didn't say anything -- I didn't

23 think it was glass.  I thought it was -- I looked at the bus

24 when I got back to the shop and I said that.

25 Q. I thought you said when the pop happened and then after

1  you realized that we bumped mirrors --

2  A.   Oh, no.

3  Q.   -- then you thought it was glass?

4  A.   No.  I never -- I never -- it never even dawned on me

5  because my -- my window isn't even open that much.

6  Q.   But you felt this debris come into the compartment of

7  the bus, and it actually hit you, right?

8  A.   Yeah.  Well --

9  Q.   And it actually hit the students also, correct?

10 A.   It didn't hit.  It was a little -- okay.  It didn't hit

11 anybody.  It was flying through the air.  It was like little

12 speckles of confetti or something.

13 Q.   I wanted to go back to your previous employment with

14 Wilson County Schools.  And you talked about the fact that

15 you worked there for a couple of years and then you had this

16 issue arise with Mr. Wendell Marlow, correct?  I guess it was

17 actually with a student that you suspended, and then

18 Mr. Marlow put him back on your bus; is that what happened?

19 A.   Correct.

20 Q.   And --

21 A.   Wait a minute.  What did you just say?  Who put him back

22 on the bus?

23 Q.   Do you remember your dealings with Mr. Marlow and an

24 issue you had concerning a student that you disciplined and

25 suspended from your bus?

A.    I disciplined a student.  He suspended the student.

Q.    And then he put him back on your bus, correct?

A.    I don't know who put him back on the bus, because guess
what?  They had already transferred me to a different route,
and then they put him back on the bus.

Q.    Now, you said that was in April of 2016, correct?

A.    I don't know what year -- what year --

Q.    When you were --

A.    I know for -- all I know is that the student was
eventually suspended from riding the bus for the rest of the
school year.  I was called into the office and reprimanded by
Jerry Partlow and Theresa Partlow [sic].  When I went back,
the little kid was back on the same route on the bus.  Now,
how he got back on that route, I don't know.  Because they
took me off the route to put the little student back on the
route.

Q.    Okay.  I thought you said that it was spring break and
Mr. Partlow presented you with an option --

A.    No.  He told me I didn't have any options.

Q.    That he --

A.    That was --

          THE COURT:  One at a time.  Let her finish and
then I'll let you finish.  Go ahead.

          THE WITNESS:  No.  He told me I did not have any
options, other than taking Mount Juliet Middle School route.

1  BY MR. SPINING:

2  Q.   And it was also at that time that you submitted a

3  medical leave request, right?  April of '16?  For your

4  rotator cuff.

5  A.   Huh-uh (negative).  You -- you have it -- you don't have

6  the dates correct.  I'm sorry.  What you're -- what you're

7  saying -- okay.  When I did that FMLA, it wasn't for -- it

8  was for depression.  It wasn't to have surgery.  No.  It

9  was -- I was so depressed at the time.  I wanted to take

10 off -- I couldn't take off.  I was seeing -- is it hearsay?

11 I was seeing my doctor and she took me off, period, from

12 driving the bus.  I was depressed.  I asked for a leave of

13 absence.  I was refused a leave of absence.

14 Q.   And then what we do know is July of '16 is when you sent

15 your resignation letter, correct?

16 A.   Yes.

17 Q.   And in your resignation letter you stated that you did

18 not feel that you were supported by Mr. Partlow; is that

19 right?

20 A.   That's correct.

21 Q.   When you submitted that letter, you did not put any

22 information or complaint or anything in the letter about

23 racial discrimination, did you?

24 A.   No.  I sure didn't.

25 Q.   And you were aware that Wilson County schools has an

1  anti-discrimination policy, right?

2  A.   I'm aware.  Yeah.

3  Q.   And yet you never in your entire employment with Wilson

4  County Schools, you never made any complaint of racial

5  discrimination against anybody, much less Mr. Partlow?

6  A.   Yes, I did.  If you would look through your papers, I

7  made the statement that when I went to Wilson County

8  transportation, I expect to be treated equally, as all -- and

9  I stated -- I made that statement in the letter.

10 Q.   In the resignation letter?

11           THE COURT:  Hold on.  Let her finish her answer.

12 Go ahead.

13           THE WITNESS:  Yeah.  I didn't -- and I also had

14 sent her a letter.  And I had talked to Mickey Hall, both

15 about my concerns about being discriminated against.  And I

16 was just told we'll get back, we'll get back.  But, yes, I

17 was aware that it was a policy for anti-discrimination, but

18 it wasn't being practiced.  And I stated that.

19 BY MR. SPINING:

20 Q.   I'm looking at Exhibit 17, which is your resignation

21 letter.  And can you point to me anywhere that it states --

22 A.   I'm not saying it's in my discrim- -- let me see.  It

23 might be.  Give me a minute.  No.  It's in the letter that I

24 wrote to Donna Wright.  It's not in my resignation letter.

25 It's in my letter that I wrote to Donna Wright.

1  Q.   And that letter, at least the date on it, is May 17th of

2  2018, correct?

3  A.   I don't know.  Whenever it was.  It might have been.

4  Because guess what?  That is when I had been terminated.

5  Q.   And for your reference, that's Exhibit 4.

6  A.   Yeah.  That's -- that's when I had been terminated.  So,

7  yeah.

8  Q.   But you didn't deliver that letter to Donna Wright

9  yourself, did you?

10  A.   No, sir.  I emailed it to her.

11  Q.   Did you email it on the 17th?

12  A.   Yes, I did.

13  Q.   Do you have the email stamp or any kind of documentation

14  that you emailed it that day?

15  A.   No, I didn't know I needed to bring it to court.

16  Q.   Also, in that letter, on the second page, in that last

17  paragraph about midway down, you talk about I would address

18  each point and facts to her no later than the next morning,

19  which I did on the evening of May 17, 2018, at 6:59 p.m.

20  A.   And the next morning, too.  I double sent it.

21  Q.   That's right.  In the morning on May 18th of 2018, at 10

22  a.m. --

23  A.   Right.  I didn't want anyone saying they didn't receive

24  it.

25  Q.   And then you say, I was terminated within three business

1 days after this meeting, right?

2 A.   Yes, sir.  Yes.

3 Q.   So you couldn't have sent the letter on May 17th,

4 because you reference events on May 18th and three days

5 later?

6 A.   I know I sent the letter after I was terminated.  And I

7 know -- if they could get a letter to me in 24 hours, you're

8 questioning how long it took for me to do this?  I don't

9 get -- I'm not understanding the logic here.

10 Q.   No.  I'm questioning how did you write a letter on May

11 17th -- you testified that you emailed this letter on May

12 17th.  And yet in the letter you're referencing events that

13 happened the next day.  So how can you email a letter and

14 reference dates in the future, events in the future?

15 A.   What did I reference that happened the next day?

16 Q.   The part I just --

17 A.   I wasn't even -- I wasn't even working for Wilson

18 County.

19 Q.   The part I just read you.

20         "And the morning of May 18th, 2018, at 10 a.m.,

21 receiving both times as successful transaction report."

22 A.   Okay.  So when was I terminated?

23 Q.   Your termination was actually on May 23rd, is when you

24 received the letter of termination.  The letter of suspension

25 was on the 17th.

1 A.    Exactly.  And this is when Rebecca Owens asked me --

2 this letter was wrote right when they gave me the papers to

3 take home and -- and -- they gave me the paper to take home

4 to answer their questions.  This letter was wrote that same

5 day.

6 Q.    But it wasn't sent.  It couldn't have been sent, because

7 you're referring to events in the future.  Correct?

8 A.    I don't know what future you're saying I'm referencing.

9 Q.    I'm -- I'm referencing the exact things I've been

10 reading to you, that a letter dated May 17th references an

11 event that occurred on May 18th.

12 A.    Okay.  So when -- whatever date that I faxed to them

13 their questions is the same date.

14 Q.    Now, you've also testified that Mr. Partlow -- I think

15 you said did not like you; is that right?

16 A.    Yes.  That's correct.

17 Q.    Now, he never said anything in a discriminatory manner

18 to you, correct?

19 A.    Incorrect.

20 Q.    And so are you referencing the statement about the new

21 sheriff in town?

22 A.    You people -- to me -- I don't like that terminology.

23 Not when somebody white standing in my face calling me you

24 people.  And other remarks that he has made.  So what are you

25 referencing?

```
 1   Q.   What other remarks?  What other remarks?
 2   A.   You're saying he didn't say it.
 3   Q.   No.  I'm asking -- so after that one --
 4   A.   I'm not saying --
 5   Q.   Or besides that one --
 6   A.   I'm not saying it was after that one.  It could have
 7   been before that one.  Because it was ongoing.
 8   Q.   What specific remarks, other than the one you just
 9   identified, did Mr. Partlow say to you?
10   A.   I guess you -- It took you long enough to get here.  I
11   took that as in a manner being shiftless and move my feet
12   slowly.  You know.  Little -- just little nitpicky things.  A
13   lot of things he said, I brushed it off.
14   Q.   Now, Mr. Partlow --
15   A.   Because I wasn't entertained by it.
16   Q.   Mr. Partlow never disciplined you, other than the
17   suspension May 17, correct?
18   A.   I didn't never give him a reason to.  And he was
19   waiting.  And he found it.  He never had a reason to
20   discipline me.  That tells you something right there.  Never
21   disciplined.
22   Q.   Now, he rehired you -- or he recommended your rehiring
23   in 2017, that school year, right?
24   A.   I don't know who recommended it.  He didn't -- he didn't
25   come to me and ask me about rehire, anything.  Guess what?
```

1  Because when my coworkers encouraged me to return to work,
2  you know, it -- Mr. Partlow wasn't part of that deal.  No.
3  Q.   And when you returned to work in 2017, August of 2017,
4  were you under any medications at that time?
5  A.   No.  I stopped taking my medication to return to -- and
6  I don't even think Mr. Partlow knew I was planning on coming
7  back in August.
8  Q.   And you had to take a drug test to return to work; is
9  that right?
10  A.   That's correct.  I passed.
11  Q.   And you testified in your deposition that you found some
12  substance at the store that you could take that would clean
13  out your system, right?
14  A.   I didn't never have to clean out my system to -- because
15  I -- guess what?  Driving the school bus, I never took my
16  pills.  I didn't -- I could -- they do -- they did random
17  drug tests.  And I have never, ever, ever failed a drug test.
18  And that's -- and I don't -- you don't know when they're
19  going to call you.  So you can't run to the store and buy
20  something.  You know.  Maybe one -- when I went to Wise
21  Coaches, if that's what you're thinking about, but not Wilson
22  County.  No.
23            MR. SPINING:  All right.  Thank you, Ms. Robinson.
24            May I have a minute, Your Honor?
25            THE COURT:  Yes.

1          (Respite.)

2          THE COURT:  You need to turn off your microphone

3  while you all are chatting.

4          (Respite.)

5          MR. SPINING:  Thank you again, Ms. Robinson.  I

6  have no further questions.

7          THE COURT:  All right.  Redirect.

8          MR. BIESECKER:  I have no questions, Your Honor.

9          THE COURT:  All right.  Ms. Robinson, you can step

10  down.   The court officer will assist you.

11          THE WITNESS:  Thank you.

12          (Witness dismissed.)

13          (End of excerpt.)

14

15

16

17

18

19

20

21

22

23

24

25

1  REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7  proceedings held in open court on January 6, 2022, in the

8  matter of PHYLLIS ROBINSON v. WILSON COUNTY SCHOOLS, Case No.

9  3:19-cv-01092; that said excerpt of proceedings in connection

10 with the hearing were reduced to typewritten form by me; and

11 that the foregoing transcript (pages 1 through 74) is a true

12 and accurate record of said proceedings.

13          This the 6th day of January, 2022.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25